UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
STATESBORO DIVISION

BENJAMIN BLOEDORN,

Plaintiff,

v.  609CV055

DR. BRUCE GRUBE, DR. TERESA THOMPSON, SUSAN NELSON, KENNETH BROWN, CORPORAL GEORGE HEMM,

Defendants.

## ORDER

### I. Introduction

Plaintiff Benjamin Bloedorn filed this 42 U.S.C §§ 1983 and 1988 complaint based on his claim that the Defendants, employees of Georgia Southern University (hereinafter, "the University"), applied a University speech policy, which allegedly deprived him of his right to free speech and due process, and his right to be free from unreasonable seizure. Ostensibly, Bloedorn, a traveling evangelist, was denied the opportunity to preach freely on the campus without having to first apply for and be granted permission under the University's speech policy. He also contests certain provisions within the University's permitting scheme, as well as particular restrictions placed by the University on the time, place, and manner of a permitted speaker's speech. Presently before the Court is Bloedorn's motion for preliminary injunction.

### II. Background

Georgia Southern University, located in Statesboro, Georgia, is a state-funded public university and a member of the University System of Georgia. Doc. ## 1 at 4; 19 at 2. Several city streets and their adjoining sidewalks extend through and/or alongside the campus. Doc. # 3-6 at 3. There are no fences or other barricades separating the campus from the city of Statesboro, and members of the public may access the campus to walk on its sidewalks and grassy areas or to visit various on-campus facilities that are open to the public, such as a botanical garden, a museum, and a performing arts center. Doc. # 1 at 5.

The University adheres to a speech policy that distinguishes between speakers who are members of the university community or are invited by members of the university community, and "outside" speakers who are not invited by a campus organization. Doc. # 3-5 at 1-2 (University policy regarding "Speakers"). According to the pertinent terms of the speech policy:

> It is the policy of Georgia Southern to permit the use of facilities by the general community in a manner which does not compete with the ongoing programs of the University. Speakers who are not sponsored by a campus organization may request permission to initiate a gathering on campus. ….
>
> If a non-campus speaker is approved, the University reserves the right to assign space and designate time frequency and length of the proposed activity. A typical length of time for a speaker is one and a half hours. Frequency should be no more than once a month under normal circumstances. … (Members of the same group or organization dealing with the same general topic will be considered one speaker for the purpose of scheduling stipulation.)

*Id.* The speech policy then outlines the following "General Policies":

A hearing may be called if it is determined that a speaker or speech will constitute or create a substantial likelihood of material interference with the normal orderly decisions and processes of the University or with the requirements of appropriate discipline. A hearing committee composed of two faculty members appointed by the President, two students appointed by Student Government, and the Vice President of Student Affairs will convene to review the speakers [sic] application. If a request is denied, the organization or the speaker may appeal to the President of the University, whose decision will be final. A hearing will be called if a speaker or speech advocates a call to action for any of the following:

[1] [t]he overthrow of any government; [2] the willful damage or destruction of property; [3] [t]he disruption of the University's regularly scheduled functions; [4] [t]he physical harm, coercion, or intimidation of the University's faculty, staff or students; [5] [o]ther campus disorder of a violent nature.

A speaker will be stopped and escorted off campus by the University Police, if evidence of a call to action to accomplish any of the above becomes manifest during a speech.

Failure to comply with any of these specified procedures will result in immediate removal from campus.

*Id.* at 2.

The "request form" seeks the following information from applicants: "name of requester," "organization represented (if applicable)," "permanent mailing address," "telephone no.(s)," "format of requested activity (meeting, speech, rally, etc.)," "preferred date(s), hour(s), and duration of requested activity," "primary topic of presentation or purpose of requested activity," "equipment, literature, and sound enhancement devices to be used during requested event," "proof of liability insurance (if applicable)," and a signature affirming that the applicant has read and agrees to abide by the University's policy governing use of campus facilities. Doc. # 3-4 ("Application for Use of Georgia Southern University Facilities").

Plaintiff Benjamin Bloedorn is a traveling Christian evangelist who frequently seeks out busy areas on college campuses in order to preach his Christian message to students and other passersby. Doc. # 1 at 3. Bloedorn has preached on over one-hundred different college campuses all over the country. *Id.* Bloedorn states that during his campus visits, he does not attempt to solicit funds or membership in any organization. *Id.* When he visits a campus, Bloedorn usually preaches for four to six hours "to generate interest in his topic." *Id.* at 4. He frequently returns to campus the next day for "follow-up," and often visits a campus two to three days in a row. *Id.*

On March 28, 2008, Bloedorn, joined by several companions, visited the University's campus in order to preach his message. Doc. # 3-2 at 2 (Bloedorn affidavit). This was Bloedorn's first time visiting the University campus. *Id.* He positioned himself "in the grassy knoll beside the Russell Union Student Center pedestrian mall and rotunda, while some of [his] colleagues stood in the pedestrian mall itself." *Id.* at 3. According to Bloedorn, the Russell Center is "a focal point of student activity," and the surrounding areas "are excellent locations for [his] message." *Id.* at 3-4. He began speaking to some of the

2

students in the area. *Id.* at 4. Shortly thereafter, an unidentified university official approached Bloedorn and indicated to him that he must submit a form to the University requesting permission to speak. *Id.* The official provided Bloedorn with a copy of the request form. *Id.* Bloedorn, however, "was not willing to go through the permit process" because he considered it "an affront to [his] religious beliefs" and because it "goes against [his] understanding of constitutional freedoms." *Id.* He also "was troubled and intimidated by the request for personal information and the topic of [his] speech." *Id.* After Bloedorn resumed preaching, he was approached by a campus police officer, who reiterated that Bloedorn could not speak on campus without a permit. *Id.* Bloedorn continued preaching despite the officer's warning that he needed to either request a permit or leave campus, or he would be arrested for trespass. *Id.* The University official then returned to the scene, and requested for a second time that Bloedorn complete and submit a request form. *Id.* at 5. According to Bloedorn, the official stated that the area where Bloedorn was preaching was the "free speech area," but that Bloedorn nonetheless needed authorization to speak there. *Id.* Bloedorn again refused to comply and instead continued preaching, whereupon he was arrested by the campus police officer. *Id.* The trespass charge against him was eventually dropped. *Id.*

As a result, Bloedorn filed the instant lawsuit. Doc. # 1. He states that "[e]ver since the arrest, [he has] wanted to got [sic] back to [the University] campus and speak with students," but that he has "refrained because [he does] not want to get arrested again." Doc. # 3-2 at 5. In particular, he contests the fact that, under the University's speech policy, (1) he is required to get permission to speak on campus, (2) permission is not automatically granted because the University reserves the right to reject any request without any objective guidelines being supplied in the policy, (3) he is required to disclose his name and contact information when applying for permission, (4) the University can designate the location and time of the speech, and (5) the University can limit the length of time and frequency of the speech, even when there is no conflict with any other speech. Doc. # 1 at 9-11. He requests that the Court grant him the following relief: (1) declare the University's speech policy unconstitutional (both on its face and as applied to his expression), (2) enter a preliminary and permanent injunction enjoining the University from applying the speech policy, (3) award him actual and/or nominal damages, and (4) award him attorney's fees and costs. *Id.* at 12.

Presently before the Court is Bloedorn's motion for preliminary injunction, doc. # 3, to which Defendants have filed a response, doc. # 19.

### III. Analysis

#### A. *Preliminary Injunction*

Bloedorn moves the Court to direct Defendants to stop applying the University speech policy to him and his religious message. Doc. # 3 at 1. Under the University's speech policy, an uninvited non-campus speaker must apply for and be granted a permit before he may present his speech anywhere on the campus. Doc. # 3-5 at 1. Before the University may deny an applicant a permit, a hearing must be held. *Id.* at 2. The policy lists the grounds upon which a hearing may or must be held. *Id.* Once the University grants a speaker permission to speak on campus, the University may limit or assign the speaker a specific time and location, and may limit the frequency and duration of his speech. The University stated in its response to the preliminary injunction motion that

3

"[p]ersons or groups not affiliated with the university are only assigned to the Free Speech area." Doc. # 19 at 5.

In his motion for preliminary injunction, Bloedorn claims that he "wished to speak in any open accessible areas located on the campus ... where students could be found...." Doc. # 3-6 at 4-5. He only claims, however, to have actually attempted to speak at "the grassy knoll area beside the Russell Union Student Center pedestrian mall and rotunda." *Id.* at 5.

"The First Amendment provides that 'Congress shall make no law ... abridging the freedom of speech....' U.S. Const. amend. I. This prohibition on laws abridging the freedom of speech has been incorporated into the Fourteenth Amendment so that it also applies to state governments." *Weaver v. Bonner*, 309 F.3d 1312, 1318 (11th Cir. 2002). The freedom is not absolute; some regulation has always been accepted (e.g., one cannot falsely shout "fire!" in a crowded theater, nor incite riots). When government regulation goes too far, however, the aggrieved speaker may ask a court to enjoin a regulator. To be entitled to a preliminary injunction,

> plaintiffs must demonstrate that (1) they have a substantial likelihood of success on the merits, (2) they will suffer irreparable injury unless the injunction issues, (3) the threatened injury to them outweighs the damage that the injunction would have on the opposing parties, and (4) if issued, the injunction would not disserve the public interest.

*This That and the Other Gift & Tobacco, Inc. v. Cobb County*, 285 F.3d 1319, 1321-22 (11th Cir. 2002).

*1. Likelihood of Success on the Merits*

When a First Amendment claim is asserted, the Court must first determine whether the plaintiff has engaged in "protected speech." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 797 (1985). If so, the Court "must identify the nature of the forum [at issue for the speech], because the extent to which the Government may limit access depends on whether the forum is public or nonpublic." *Id.* After identifying the type of forum, the Court "must assess whether the justifications for exclusion from the relevant forum satisfy the requisite standard." *Id.*

**(a) Whether the Speech is Protected**

Neither party disputes the fact that religious speech of the type in which Bloedorn wishes to engage is protected speech under the First Amendment.

**(b) Forum Classification**

"State colleges and universities are not enclaves immune from the sweep of the First Amendment." *Healy v. James*, 408 U.S. 169, 180 (1972). Nonetheless, "the First Amendment does not guarantee access to property simply because it is owned or controlled by the government." *Perry Educ. Ass'n. v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 (1983) (internal quotations omitted). "[T]he State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated," and "[t]he existence of a right of access to public property and the standard by which limitations upon such a right must be evaluated differ depending on the character of the property at issue." *Id.* at 44, 46.

The Supreme Court has defined several kinds of government-owned property for First Amendment purposes: the traditional public forum, the designated public forum, and the nonpublic forum. *Id.* at 45-46. The Eleventh Circuit has elaborated,

Traditional public fora generally include public streets and parks. Designated public fora are created when the government opens property to the public for expressive activity and are subject to the same standards as traditional public fora. In traditional or designated public fora, the state may "enforce regulations of the time, place, and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels for communication." *Perry*, 460 U.S. at 45-46; *Sentinel Communications Co. v. Watts*, 936 F.2d 1189, 1201, 1202 (11th Cir. 1991). A nonpublic forum is "[p]ublic property which is not by tradition or designation a forum for public communication," and limits on access to such a forum must meet only a reasonableness standard. *Perry*, 460 U.S. at 46.

*Crowder v. Housing Auth. of Atlanta*, 990 F.2d 586, 590-91 (11th Cir. 1993).

One subset within the "designated public forum" category is the "*limited* public forum." *Id.* at 591 (citing *Perry*, 460 U.S. at 46). "A limited public forum is a forum for certain groups of speakers or for the discussion of certain subjects." *Id.* at 591. A state's reservation of a public forum to certain groups will be upheld if the restriction is content-neutral and reasonable in light of the purpose of the forum. *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106-07 (2001).

Bloedorn seeks access to a variety of open, outdoor areas of the University campus. In particular, he urges that the sidewalks adjacent to public streets that run alongside and through the campus, as well as the pedestrian mall and rotunda outside of the Russell Student Center are traditional public fora. According to Bloedorn, the campus sidewalks at issue should be so classified because they resemble city sidewalks, which enjoy a "presumptive" traditional public forum status. Doc. # 3-6 at 10-11. As for the pedestrian mall and rotunda outside of the Russell Student Center, Bloedorn urges that these areas are compatible with expression and they "share the same physical objective characteristics with parks off campus," which, like sidewalks, "generally are considered, *without more*, to be public forums." *Id.* at 11-12 (quoting and adding emphasis to *U.S. v. Grace*, 461 U.S. 171, 177 (1983)). Finally, Bloedorn avers that the grassy knoll area outside of the Russell Student Center is "at least a designated public forum," since the University has designated it a "free speech area." He claims he falls into the class of speakers for which the free speech area has been designated, and that the Court, in scrutinizing the restrictions at issue here, should therefore consider the area as equivalent to a traditional public forum.

The University, on the other hand, argues that the campus areas at issue are all limited public fora, since "[t]he University has not adopted a policy generally opening its outdoor areas for public speech," and "[t]he public has not been, by tradition or policy, permitted to come to the University campus and engage in public discourse without restriction or limitation," and since the limited facilities that the University has opened to non-speakers may be used only "in a manner which does not compete with the ongoing programs of the University." Doc. # 19 at 12, 16. Notably, in its response to the motion for preliminary injunction, the University states that outsiders given approval to speak on campus are only assigned to the "free speech area." Doc. # 19 at 5.

5

Despite Bloedorn's desire to have the Court undertake a piecemeal forum categorization of each of the campus areas he has referenced, the Court finds it more appropriate to address and categorize the campus as a whole, since outsiders must utilize and abide by the at-issue speech policy in order to access *any* part of the campus for purposes of public speech. *See* doc. # 3-5 at 1 (The speech policy states, "Speakers who are not sponsored by a campus organization may request permission to initiate a gathering on campus. ...[T]he University reserves the right to assign space... [for] the proposed activity."); *see also Gilles v. Torgersen*, 71 F.3d 497, 501 (4th Cir. 1995) (explaining that the campus' sponsorship requirement for outside speakers "addresses the question of campus access generally; it is not framed as a condition on access to the drillfield alone (or any other specific facility)," and that being granted sponsorship by the University therefore merely granted plaintiff "threshold access to the campus," with any specific location designations or restrictions being applied thereafter).

Clearly neither the campus, nor any particular part of it, qualifies as a traditional public forum. Bloedorn focuses most of his arguments on the physical characteristics of the areas, and how they resemble parks and sidewalks that -- when positioned within cities -- are usually considered traditional public fora. Unfortunately for Bloedorn, however, "the Supreme Court has held that '[t]he mere physical characteristics of the property cannot dictate forum analysis.'" *Sentinel Commc'ns Co. v. Watts*, 936 F.2d 1189, 1204 (11th Cir. 1991) (quoting *U.S. v. Kokinda*, 497 U.S. 720, 727 (1990)). The Supreme Court has also noted that college campuses "differ[] in significant respects from public forums such as streets or parks or even municipal theaters." *Widmar v. Vincent*, 454 U.S. 263, 267 n.5 (1981). In *Widmar*, the Supreme Court explained,

> [a] university's mission is education, and decisions of this Court have never denied a university's authority to impose reasonable regulations compatible with that mission upon the use of its campus and facilities. We have not held, for example, that a campus must make all of its facilities equally available to students and non-students alike, or that a university must grant free access to all of its grounds or buildings.

*Id.* Moreover, Bloedorn has not presented any evidence showing that the University "intend[ed] to open the forum to the same panoply of activity permitted" in city sidewalks and parks. *Sentinel Commc'ns Co.*, 936 F.2d at 1204. Nor has he shown that the University has since dedicated -- or even enabled the use of -- any portion of its campus as a traditional public forum.

Based on all these considerations, the Court finds that the University campus in general is a limited public forum, since access to outsiders is restricted. That is, only speakers who are members of the University community (or their invitees) appear to have automatic access to any of the campus' sub-fora (i.e., they can generally utilize the campus' public fora without a permit). Outsiders, on the other hand, must get a permit to speak publicly *anywhere* on the campus.

The Court, having deemed the campus a limited public forum, must now determine the proper standard under which to analyze the at-issue provisions of the University's speech policy.

6

### (c) Standards for Regulating the Forum

"[T]he government may restrict access to limited public fora by content-neutral conditions for the time, place, and manner of access, all of which must be narrowly tailored to serve a significant government interest," and it must "leave open ample alternative channels of communication." *Crowder*, 990 F.2d at 591 (citing *Perry*, 460 U.S. at 45-46). "In addition to time, place, and manner regulations, the [government] may reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Perry*, 460 U.S. at 46. To put it another way, "[t]he restriction must not discriminate against speech on the basis of viewpoint, ... and the restriction must be 'reasonable in light of the purpose served by the forum.'" *Good News Club*, 533 U.S. at 106-07 (citing *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995) and *Cornelius*, 473 U.S. at 806).

To clarify (because the parties vehemently argued for the application of conflicting standards here),[1] in defining the boundaries of the limited public forum here, the University is limited only by reasonableness and viewpoint neutrality requirements. Here, "reasonableness" requires that the limitation on the class of speakers be reasonable in light of the University's purpose or mission, which is education. However, after establishing reasonable and viewpoint-neutral limitations as to the *types of speakers* allowed to use the forum (here, members of the University community, their invitees, and -- the category at issue here -- outsiders granted permission after submitting a request form), the University may then impose restrictions on the time, place, and manner of those speakers' use of the forum, so long as those time, place, and manner restrictions are content-neutral, and narrowly tailored to serve a significant government interest, and as long as they leave open ample alternative channels of communication.

The Court will thus proceed to apply the standards to the relevant provisions at issue.

### (d) Permit Requirement

Because the requirement that uninvited outsiders apply for and receive a permit in order to speak on campus is a restriction limiting the class of speakers granted access to the forum, it is subject only to the requirement that it must be viewpoint-neutral and reasonable in light of the purpose served by the forum.

First, the requirement is clearly viewpoint-neutral. In order to speak on campus, *any* outside speaker who is not sponsored by a University group must apply for and receive a permit. Nothing in the University's speech policy limits or excludes speakers from being eligible for a permit based on their particular viewpoint.[2] And Bloedorn has not presented any evidence tending to show that the University applies some unwritten policy against granting permits to speakers with particular viewpoints. Next, the limitation that

---

[1] *Compare* doc. # 19 at 16 (The University states that, "[because] the University has retained the campus as a limited public forum ... it may enact viewpoint neutral restrictions that are reasonable in light of its educational mission."), *with* doc. # 25 at 4 (Bloedorn urges that "[b]oth this Court and the Eleventh Circuit have recognized that regulations in a limited public forum are subject to the same scrutiny as that applied in a traditional public forum.").

[2] In fact, the permitting scheme is virtually *content-neutral*, save for some limitations on speech that advocates violence, destruction, or the overthrow of government. *See* doc. # 3-5 at 2.

7

unsponsored outsiders may only speak on campus if they have submitted a request form and been given permission is especially reasonable in light of the University's educational mission. Having such persons submit request forms serves to alert University administrators that an outside speaker (or a group of speakers) intends to set up on campus at a particular time.³ This enables the administrator to gather contact and other information for an otherwise unidentifiable individual or group, in order to make any necessary preparations to the area of campus that the speaker will use, to arrange security officials to ensure the safety of the speakers and any bystanders, and to coordinate multiple uses of the area in the event that more than one speaker or group of speakers intends to visit the campus on a particular day. Maintaining safety, efficiency, and order on campus are crucial to the furtherance of the University's mission of providing a proper educational environment. Therefore, the University's requirement that an outside speaker notify the University of his desire to set up on campus and that a University administrator sign off on this request is reasonable in light of the University's mission.

Bloedorn has additionally challenged the fact that the University retains the right to reject any outside speaker's request to speak on campus, a discretionary decision which he claims is unguided by any meaningful standards. Doc. # 3-6 at 15-16. Contrary to Bloedorn's assertions, however, the permitting scheme is not administered in an improper way that restrains speech. First, University officials are not given overly broad discretion in granting or denying permission. Under the terms of the policy, permission is never denied outright; before permission can be denied, a hearing is called to determine whether the particular speech should be permitted on campus despite some particular concern. Doc. # 3-5 at 2. The speech policy lists specific grounds upon which a hearing *may* be called (if the administration determines that the speech "will constitute or create a substantial likelihood of material interference with the normal orderly decisions and processes of the University"), and also grounds upon which a hearing *must* be called (for instance, if the speaker advocates the overthrow of any government, or campus disorder of a violent nature). *Id.* These grounds pass constitutional muster, as they are "reasonably specific and objective, and do not leave the decision [of whether to grant or deny a permit] to the 'whim of the administrator,'" *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 324 (2002) (quoting *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 133 (1992)), and since they are "'narrowly drawn, reasonable and definite standards' to guide the [administrator's] determination." *Id.* Moreover, if a speaker is denied access by the hearing committee, he may appeal to the President of the University. Doc. # 3-5 at 2. Thus, the policy provides for meaningful review of an initial permit refusal. For the foregoing reasons, the discretion granted to the University in administering the permitting scheme does not render it unconstitutional.

Finally, Bloedorn urges that, in order to apply for a permit, he is improperly required to divulge his name, contact information, and the primary topic or purpose of his intended activity on campus in the request form. The Court likewise assesses this

---

³ Notably, members of the University community must complete and submit the same exact request form in order to reserve facilities on campus. Doc. # 19 at 5. This further evidences that the University uses the form not to review and restrain certain types of speech (or outsider speech in general), but that the form is used for practical purposes, primarily facilitating the use of campus resources by multiple speakers or groups.

requirement under the "reasonable and viewpoint-neutral" standard, as it is part of the scheme by which the University limits the class of speakers who may access the campus. This requirement, however, is – like the permit requirement itself – both viewpoint-neutral and reasonable. As noted above, the University has an interest in maintaining campus safety in order to support its educational mission. Providing such contact information holds a speaker accountable in the event that any injuries or property damage occur while the speech is taking place. Moreover, it serves an important administrative purpose, as it allows the University to contact the speaker or the speaker's group to make initial arrangements for the speaker's speech, or to contact the speaker in the event that alterations must be made to the initial arrangements (for instance, if the particular area of campus to which the speaker was assigned has been double-booked). Finally, it allows the administration to properly assess the level of security that may be necessary. For instance, less security would likely be deemed necessary for a speaker who will be speaking or leafleting on a rather innocuous topic such as debt relief, than if the speaker were planning to speak on a traditionally more inflammatory topic such as abortion or homosexuality. As a result, it is reasonable for the University to seek such information, as it furthers the goal of maintaining a safe and efficient educational environment for its students.

For the forgoing reasons, the Court finds that the permit requirement and the challenged policies within it are reasonable in light of the University's educational mission.[4]

### (e) Time, Place, and Manner Restrictions

As previously explained, the time, place, and manner restrictions that the University places on its permitted classes of speakers must be content-neutral, narrowly-tailored to serve a significant government interest, and must leave open ample alternative channels of communication.

Bloedorn challenges the University's reservation of the right to designate the location and time of a permitted outside-speaker's speech, even where there is not a conflict with another speaker in the desired space at the requested time period. Relatedly, Bloedorn also challenges the University's limits on the length of time and frequency of a permitted outside-speaker's speech,[5] even where the speaker's speech does not conflict with the use of campus resources by other speakers.

First, the University's reservation of such control over the time, place, and manner of an outsider's speech is content-neutral, as nothing in the speech policy itself

---

[4] The Court further notes that the requirement that an outside speaker seek and be given a permit seems far less onerous than other frequently-challenged (and frequently-upheld) restraints on speech at other campuses. For instance, in *Gilles v. Hodge*, the Southern District of Ohio upheld a Miami University policy requiring that an outside speaker be *sponsored* by a student organization in order to speak anywhere on campus. 2007 WL 1202706, at *8. The Court there commented that the sponsorship requirement furthers Miami University's educational mission "because speech is thereby limited to matters in which at least one group of students is interested." *Id.* In contrast, the Georgia Southern University policy at issue here generally allows any outside speaker to speak on campus, regardless of whether any students or student groups have previously expressed interest in the topic, so long as the speaker's message does not fall into one of the limited categories requiring a hearing.

[5] In its speech policy, the University states that "[a] typical length of time for a speaker is one and a half hours [and] [f]requency should be no more than once a month under normal circumstances." Doc. # 3-5 at 1.

9

(nor any evidence presented by Bloedorn) indicates that the University applies these requirements differently (or not at all) depending on the content of the speaker's message.[6]

The Court thus must next assess whether these restrictions are narrowly tailored to serve a significant government interest and whether they preserve ample alternative channels of communication. The issue of alternative channels of communication has not been a focus by the parties here, likely since they exist in abundance in the form of city streets and sidewalks that run through and around the campus. (In fact, Bloedorn himself has described some of the University sidewalks and the city sidewalks as "indistinguishable" from one another. Doc. # 3-6 at 2.). Likewise, the issue of significant government interests is not subject to much debate here. The primary interest identified by the University is protecting the University's ability to engage in its mission of providing education. Doc. # 19 at 16. The Supreme Court has long recognized that a university's mission is education and that universities therefore have a right to regulate and restrict the use of their facilities in furtherance of that mission. *See Widmar*, 454 U.S. at 267 n.5 (1981) ("A university's mission is education, and a decision of this Court has never denied a university's authority to impose reasonable regulations compatible with that mission upon the use of its campus and facilities."). The University has identified several ways in which its regulations on the time, place, and manner of permitted outsiders' speech furthers its significant educational purpose: preventing persons not affiliated with the University from monopolizing the space for days at a time; allowing the University to schedule adequate security personnel to ensure the safety of speakers and students; and allowing students to encounter the views of others while minimizing disruptions of the educational setting, and allowing for the coordination of use of University property. Doc. # 19 at 19-20.

Thus, the question that remains is whether the ordinance is narrowly tailored. Notably, in order to be narrowly tailored, a regulation need not be the least restrictive means of regulation; it must simply further the government interest in a way that would be achieved less effectively without the regulation. *See Ward v. Rock Against Racism*, 491 U.S. 781, 798-99 (1989). The Court finds that the restrictions at issue are sufficiently narrowly tailored to serve the University's significant interest in furthering its educational purpose. As the learned Judge Posner explained in *Gilles v. Blanchard*, if a university cannot place certain areas of its campus "completely off limits to uninvited outsiders ... without violating the Constitution, public universities cannot control their property.... Letting [outsiders] into the middle of campus would disrupt the campus atmosphere." 477 F.3d 466, 471 (7th Cir. 2007). For the same reasons, the University must be able to limit the time of day, length of time, and frequency of an outsider's speech on its campus. To be sure, the restrictions may mean that, from time to time, an outside speaker will not be permitted to speak at his time or place of choice, or for his desired length of time or with his desired level of frequency. It is only logical, however, that the University has the final word in the time, place, and

---

[6] Although the University stated that outside speakers were only assigned to speak in the "free speech area," and although Bloedorn listed several specific areas of campus where he desired to speak, the Court declines to address the propriety of this specific unwritten policy, as it is not currently at issue since Bloedorn did not submit a request form at all, much less did he submit a form requesting to speak in any particular area (and, in fact, he only actually attempted to speak in the "free speech area").

manner of speech on its property. In the absence of any evidence that the University abuses this authority and applies this policy in a way that stifles speech, the Court finds that these restrictions satisfy the applicable constitutional standards.

The Court, having found that Bloedorn is not likely to succeed on the merits of his claim, need not proceed with an examination of the remaining factors for a preliminary injunction. *See Church v. City of Huntsville*, 30 F.3d 1332, 1341-45 (11th Cir. 1994) (explaining that a movant will not be granted a preliminary injunction unless he "clearly carries the burden of persuasion as to the *four* prerequisites," and overturning the district court's grant of a preliminary injunction simply because the movant had not met the first prerequisite by showing a likelihood of success on the merits) (emphasis added).

As a result, Bloedorn's request for a preliminary injunction is ***DENIED***. Doc. # 3.

This day of 23 November 2009.

*[signature]*

B. AVANT EDENFIELD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA