# UNITED STATES COURT OF APPEALS
## For the Eleventh Circuit

No. 10-10168

District Court Docket No.
6:09-cv-00055-BAE-GRS

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JAN 28, 2011
JOHN LEY
CLERK

A True Copy - Attested
Clerk U.S. Court of Appeals,
Eleventh Circuit

By: _____
Deputy Clerk
Atlanta, Georgia

BENJAMIN BLOEDORN,

Plaintiff - Appellant,

versus

DR. BRUCE GRUBE,
in his official capacity as President of Georgia Southern University,
DR. TERESA THOMPSON,
in her official capacity as Vice President of Student Affairs and Enrollment Management for Georgia
Southern University,
SUSAN NELSON,
in her official capacity as Facilities Use Coordinator of Georgia Southern University,
KENNETH BROWN,
in his official capacity as Director of Public Safety Department for Georgia Southern University,
CORPORALGEORGE HEMM,
individually and in his official capacity as Public Safety Corporal of Public Safety Department of
Georgia Southern University,

Defendants - Appellees.

Appeal from the United States District Court for the
Southern District of Georgia

## JUDGMENT

It is hereby ordered, adjudged, and decreed that the attached opinion included herein by reference, is
entered as the judgment of this Court.

Entered: January 28, 2011
For the Court: John Ley, Clerk of Court
By: Nancy M. Gilman

ISSUED AS MANDATE
FEB 2 8 2011
U.S. COURT OF APPEALS
ATLANTA GA

[PUBLISH]

## IN THE UNITED STATES COURT OF APPEALS

### FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JAN 28, 2011
JOHN LEY
CLERK

No. 10-10168

D.C. Docket No. 6:09-cv-00055-BAE-GRS

BENJAMIN BLOEDORN,

Plaintiff - Appellant,

versus

DR. BRUCE GRUBE,
in his official capacity as President of Georgia Southern University,
DR. TERESA THOMPSON,
in her official capacity as Vice President of Student Affairs and Enrollment
Management for Georgia Southern University, et al.,

Defendants - Appellees.

Appeal from the United States District Court
for the Southern District of Georgia

(January 28, 2011)

Before HULL and MARCUS, Circuit Judges, and WHITTEMORE,[*] District Judge.

MARCUS, Circuit Judge:

Benjamin Bloedorn, a Christian evangelical preacher, appeals from the denial of his motion for a preliminary injunction, which sought, on First Amendment grounds, to enjoin Georgia Southern University ("GSU" or the "University") from enforcing its free speech policies regulating the access of outside, non-sponsored speakers to the university campus and the permitting scheme regulating the conduct of these speakers (collectively the "Speech Policy"). On this preliminary record, Bloedorn has not shown that the district court abused its discretion nor has he established a substantial likelihood of success on the merits. Accordingly, we affirm.

I.

These are the essential facts adduced on the limited record presented to this Court.

On March 28, 2008, Bloedorn, an itinerant preacher who frequently seeks out busy areas on college campuses to broadcast his evangelical message for four to six hours at a time on continuous days, along with several companions, arrived at GSU. Georgia Southern University is a state-funded public university with over

---

[*] Honorable James D. Whittemore, United States District Judge for the Middle District of Florida, sitting by designation.

18,000 students located in Statesboro, Georgia. Bloedorn's visit to this large campus was sponsored neither by GSU nor by any affiliated University group or organization.

Bloedorn began preaching from a heavily trafficked grassy knoll next to GSU's Russell Union Student Center and adjacent to the University's Pedestrian Mall and Rotunda. Bloedorn's companions stood in the Pedestrian Mall. The grassy knoll from which Bloedorn chose to speak was, as it turned out, GSU's designated Free Speech Area. Notably, this is the only designated area on campus where outside, non-sponsored speakers drawn from the general public may engage in expressive conduct.

Soon after Bloedorn began preaching, a University official approached Bloedorn and informed him that, before he could use the Free Speech Area, he was required to seek and obtain a permit from GSU. Bloedorn refused to comply with the permitting process, deeming it an "affront" to his beliefs and arguing that it violated his basic constitutional freedoms. Bloedorn resumed preaching. Again, he was approached, this time by GSU Department of Public Safety Corporal George Hemm, who explained that Bloedorn, as an outside, non-sponsored speaker, could not speak on campus without a permit. Still again, Bloedorn resumed preaching despite the officer's warning that he could be arrested for

3

trespass. At that point, Laura McCullough, a Public Safety Captain, arrived on the
scene and asked Bloedorn to complete and submit a permit request form. For the
third time, Bloedorn refused to apply for a permit, whereupon he was arrested by
Corporal Hemm for trespass.[1]

GSU's Speech Policy distinguishes between speakers who are members of
the GSU community or are sponsored by community members and those who are
drawn from outside of the University community and who are not sponsored by a
University group or member. The Speech Policy begins this way:

> It is the policy of Georgia Southern to permit the use of facilities by the
> general community in a manner which does not compete with the
> ongoing programs of the University. Speakers who are not sponsored
> by a campus organization may request permission to initiate a gathering
> on campus. . . .

> If a non-campus speaker is approved, the University reserves the right
> to assign space and designate time frequency and length of the proposed
> activity. A typical length of time for a speaker is one and a half hours.
> Frequency should be no more than once a month under normal
> circumstances.

The Speech Policy also codifies the following "General Policies":

> A hearing may be called if it is determined that a speaker or speech will
> constitute or create a substantial likelihood of material interference with
> the normal orderly decisions and processes of the University or with the
> requirements of appropriate discipline. A hearing committee composed
> of two faculty members appointed by the President, two students
> appointed by Student Government, and the Vice President of Student

---

[1] The criminal trespass charge against Bloedorn was later dropped.

Affairs will convene to review the speakers [sic] application. If a request is denied, the organization or the speaker may appeal to the President of the University, whose decision will be final.

A hearing will be called if a speaker or speech advocates a call to action for any of the following:

[1] [t]he overthrow of any government; [2] [t]he willful damage or destruction of property; [3] [t]he disruption of the University's regularly scheduled functions; [4] [t]he physical harm, coercion, or intimidation of the University's faculty, staff or students; [5] [o]ther campus disorder of a violent nature.

The permit request form for outside, non-sponsored speakers directs the applicant to provide the following basic information: name; organization represented, if applicable; permanent mailing address; telephone number; type of requested activity; preferred date(s), hour(s), and duration of requested activity; primary topic or purpose of requested activity; equipment, literature and sound enhancement devices to be used; proof of liability insurance, if applicable; and a signature confirming that the applicant has read and agreed to GSU's policy governing the use of campus facilities. The form is available both online and at the Russell Union Student Center, and is exactly the same form that University groups and members must use to reserve space on the campus. In assigning a date and time to an outside, non-sponsored speaker, apparently it is GSU's undisputed practice to honor the speaker's requested date and time so long as the space is not already reserved by another speaker. Any time an outside, non-sponsored speaker

5

reserves the Free Speech Area, the University's Department of Public Safety is notified, and two public safety officers are assigned to maintain security throughout the duration of the event. From 2006 through August 2009, six outside, non-sponsored speakers completed permit requests for the Free Speech Area, and all six requests were granted.

Pursuant to the terms of the Speech Policy, all outside, non-sponsored speakers (like Bloedorn) may speak only in the designated Free Speech Area after receiving a permit. Throughout the academic year, this prime campus location is utilized by GSU's more than 18,000 students, as well as by University-sponsored programs and by outside, non-sponsored speakers. GSU's Assistant Director for Facilities Susan Nelson explained the primacy of the location this way:

> The Free Speech area is located in a grassy area outside of the Russell Union Building and is in very close proximity to the Rotunda. The area has very heavy student traffic, including traffic for eating facilities and a bus stop for the Georgia Southern University bus service.
>
> During the academic year, the Free Speech area and Rotunda are heavily utilized by university students and/or for university programs. Students and university personnel may reserve space in the Rotunda for any number of purposes and events. During the academic year, this area as a whole is in use five out of seven days a week.

Undeniably, the Free Speech Area is situated at the crossroads of the University. Indeed, as Bloedorn himself recognized, the Free Speech Area is "a focal point of

6

student activity," and its surrounding areas "are excellent locations for [his] message."

More than a year after he was arrested and removed from the campus, on July 13, 2009, Bloedorn commenced this civil rights action in federal district court, pursuant to 42 U.S.C. §§ 1983 and 1988, against several employees of GSU, including the President of the University, the Vice President for Student Affairs, the Facilities Use Coordinator, the Director of the Public Safety Department, and a Public Safety Corporal. Bloedorn claims that the Speech Policy deprived him of his rights to free speech and due process, as well as the right to be free from unreasonable seizure. Bloedorn says that he has been unable to return to the campus to speak because he is fearful of re-arrest. In his complaint, Bloedorn elaborates that ever since the arrest, he has wanted to return to the campus to speak with students. He argues that the University's Speech Policy violates his expressive rights in four discrete ways: (1) by prohibiting outside, non-sponsored speakers from engaging in expressive conduct on the campus outside of the Free Speech Area; (2) by requiring an outside, non-sponsored speaker to apply for a permit 48 hours in advance; (3) by requiring the outside speaker to disclose basic contact information on the permit request form; and (4) by restricting the speech of an outside, non-sponsored speaker to one-and-one-half hours, once per month.

7

On November 24, 2009, a district judge in the Southern District of Georgia denied Bloedorn's motion for a preliminary injunction. The district court, evaluating the University campus as a whole, concluded that the entire campus was a "limited public forum" and, as a result, analyzed all of GSU's time, place, and manner restrictions on outside, non-sponsored speakers only for viewpoint neutrality and reasonableness. Under this rubric, it determined that Bloedorn could not show a substantial likelihood of success on any of his claims; because Bloedorn had not demonstrated a substantial likelihood of success on the merits, the court did not address any of the remaining requirements for a preliminary injunction. Finally, the district court did not address Bloedorn's claim that the University's prohibition on expressive conduct by an outside, non-sponsored speaker anywhere on the campus, except the designated Free Speech Area, violated the Constitution because Bloedorn lacked standing to raise this claim. This interlocutory appeal followed.

## II.

At the outset, we are required to examine whether Bloedorn has Article III standing to bring these claims. <u>Fla. Family Planning Council v. Freeman</u>, 561 F.3d 1246, 1253 (11th Cir. 2009). All of the parties agree that Bloedorn bears the

ultimate burden of establishing standing, and that to do so requires him to show

that:

> (1) the plaintiff . . . suffered an injury in fact -- an invasion of a legally
> protected interest which is (a) concrete and particularized and (b) actual
> or imminent, not conjectural or hypothetical; (2) there must be a causal
> connection between the injury and the conduct complained of -- the
> injury has to be fairly traceable to the challenged action of the
> defendant, and not the result of the independent action of some third
> party not before the court; and (3) it must be likely, as opposed to merely
> speculative, that the injury will be redressed by a favorable decision.

Id. (internal quotation marks omitted).  Although Bloedorn did not seek a permit

from the University and did not attempt to speak anywhere on the campus other

than at the Free Speech Area, he has standing to pursue his claims concerning all

of the restrictions GSU has placed on outside, non-sponsored speakers.

In the first place, Bloedorn did suffer an injury in fact that is both concrete

and imminent with respect to his ability to speak throughout the GSU campus.

See id.  In determining whether an injury is imminent, the law "requires only that

the anticipated injury occur within some fixed period of time in the future.

Immediacy, in this context, means reasonably fixed and specific in time and not

too far off." Am. Civil Liberties Union of Fla., Inc. v. Miami-Dade Cnty. Sch.

Bd., 557 F.3d 1177, 1193-94 (11th Cir. 2009) (internal quotation marks,

alterations, and citation omitted); Pittman v. Cole, 267 F.3d 1269, 1283 (11th Cir.

2001) ("[T]he injury requirement is most loosely applied -- particularly in terms of

9

how directly the injury must result from the challenged governmental action --
where First Amendment rights are involved, because of the fear that free speech
will be chilled even before the law, regulation, or policy is enforced.") (internal
quotation marks omitted).  Moreover, a plaintiff need not expose himself to
enforcement of a law to challenge it in the First Amendment context; instead, "an
actual injury can exist when the plaintiff is chilled from exercising her right to free
expression or forgoes expression in order to avoid enforcement consequences."
Pittman, 267 F.3d at 1283 (internal quotation marks omitted).  But, in order to
establish standing, the plaintiff must show that he has an unambiguous intention at
a reasonably foreseeable time to engage in a course of conduct arguably affected
with a constitutional interest, but proscribed by a statute or rule, and that there is a
credible threat of prosecution.  Id.

As an outside, non-sponsored speaker, Bloedorn attempted to speak on the
campus, without knowledge that he was coincidentally standing in the Free Speech
Area, and was turned away from the campus as a whole, because he refused to
comply with the University's Speech Policy.  He was arrested after refusing to
apply for a permit and refusing to comply otherwise with GSU's Speech Policy.
Bloedorn wanted to speak at various locations on the GSU campus without
obtaining a permit or otherwise having his expressive conduct limited, and the

10

Speech Policy prevented him from so doing. Moreover, Bloedorn has averred that he intends to return and proselytize on the GSU campus, but he has not done so because of his fear of re-arrest. On this record, there is every indication that GSU would re-arrest Bloedorn if he returned to campus to speak in the Free Speech Area without a permit or, for that matter, to speak anywhere else on campus. This is enough to establish an injury in fact that is actual, concrete, and particularized.

Also, there is a causal connection between Bloedorn's injuries -- his inability to speak in the open accessible areas of GSU and in the Free Speech Area without complying with the permit requirements -- and GSU's Speech Policy. See Fla. Family Planning Council, 561 F.3d at 1253. As Bloedorn explained in his affidavit, "[i]f not for the speech policy, and the actions of [GSU], I would return to the open accessible areas of GSU and share my message." There is nothing else preventing Bloedorn from spreading his message on the campus. Finally, there can be little doubt that each of Bloedorn's complained of injuries could be redressed by a favorable decision in the case. See Fla. Family Planning Council, 561 F.3d at 1253.

In short, Bloedorn has standing to pursue his claims.

III.

11

We begin our analysis with the unremarkable observation that a preliminary injunction in advance of trial is an extraordinary remedy. United States v. Jefferson Cnty., 720 F.2d 1511, 1519 (11th Cir. 1983). The purpose of the preliminary injunction is to preserve the positions of the parties as best we can until a trial on the merits may be held. Univ. of Tex. v. Camenisch, 451 U.S. 390, 395 (1981). In order to prevail on an application for a preliminary injunction, the plaintiff must clearly establish all of the following requirements:

> (1) . . . a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest.

Am. Civil Liberties Union of Fla., Inc., 557 F.3d at 1198 (internal quotation marks omitted). If Bloedorn is unable to show a substantial likelihood of success on the merits, we need not consider the other requirements. See Pittman, 267 F.3d at 1292.

We review the district court's denial of a preliminary injunction generally for an abuse of discretion, but we examine the legal conclusions on which the denial is based de novo. Am. Civil Liberties Union of Fla., Inc., 557 F.3d at 1198. Moreover, we review the core constitutional facts de novo, unlike historical facts,

12

which are measured only for clear error. Id. The difference between historical and

constitutional facts has been framed this way:

> [O]rdinary historical facts. . . . are facts about the who, what, where,
> when, and how of the controversy . . . .
>
> By contrast, under the assumptions about the law that we have
> made for purposes of deciding this case, we must determine the "why"
> facts. Those are the core constitutional facts that involve the reasons the
> [defendant] took the challenged action . . . .
>
> We must find the disputed "why" facts -- the motive facts --
> ourselves, as though the district court had never made any findings
> about them.

Id. at 1206-07.

It is by now clear that the First Amendment does not guarantee access to

property just because it is owned by the government. Cornelius v. NAACP Legal

Def. & Educ. Fund, Inc., 473 U.S. 788, 803 (1985). Rather, we are required to

examine the policy and practice of the government to determine whether it

intended to open a specific place for public discourse. See Ark. Educ. Television

Comm'n v. Forbes, 523 U.S. 666, 677 (1998). Thus, by example, the mere fact

that the "Justice Department in Washington has a large auditorium, with a stage,

and so would be a suitable venue for a theatrical production" does not compel the

conclusion that the First Amendment requires the Justice Department to make that

space available to the public for that purpose. Gilles v. Blanchard, 477 F.3d 466,

13

469-70 (7th Cir. 2007). By the same token, the fact that a University may make a discrete location on a sprawling campus available for public discourse does not compel the conclusion that it must open the doors of all of its facilities for public discourse.

> As the Supreme Court explained almost thirty years ago:
>
> A university differs in specific respects from public forums such as streets or parks or even municipal theaters. A university's mission is education, and decisions of this Court have never denied a university's authority to impose reasonable regulations compatible with that mission upon the use of its campus and facilities. We have not held, for example, that a campus must make all of its facilities equally available to students and nonstudents alike, or that a university must grant free access to all of its grounds or buildings.

Widmar v. Vincent, 454 U.S. 263, 267 n.5 (1981).

In order to help answer whether government property may be utilized for an expressive purpose by the general public, the courts have resorted to classifying the character of the property. When a regulation in some way limits or bars the use of government property as a forum for expression, we begin our analysis by asking about the nature of the government property involved. United States v. Frandsen, 212 F.3d 1231, 1237 (11th Cir. 2000). Thus, the Supreme Court has broadly discerned three distinct (although not airtight) categories of government property for First Amendment purposes: traditional public fora, designated public fora, and limited public fora. See, e.g., Christian Legal Soc'y Chapter of the Univ.

14

of Cal., Hastings College of the Law v. Martinez, -- U.S. --, 130 S. Ct. 2971, 2984
n.11 (2010); Pleasant Grove City v. Summum, -- U.S. --, 129 S. Ct. 1125, 1132
(2009). And, the degree of scrutiny we place on a government's restraint of
speech is largely governed by the kind of forum the government is attempting to
regulate. This is so because "the First Amendment does not guarantee the right to
communicate one's views at all times and places or in any manner that may be
desired." Heffron v. Int'l Soc'y for Krishna Consciousness, Inc., 452 U.S. 640,
647 (1981). Thus, "[t]he Government, like any private landowner, may preserve
the property under its control for the use to which it is lawfully dedicated."
Sentinel Commc'ns Co. v. Watts, 936 F.2d 1189, 1201 (11th Cir. 1991) (internal
quotation marks omitted). It is equally clear, however, that state-funded
universities, such as GSU, are government property, "not enclaves immune from
the sweep of the First Amendment." Healy v. James, 408 U.S. 169, 180 (1972).

Traditional public fora are public areas such as streets and parks that, since
"time out of mind, have been used for purposes of assembly, communicating
thoughts between citizens, and discussing public questions." Perry Educ. Ass'n v.
Perry Local Educators' Ass'n, 460 U.S. 37, 45 (1983) (internal quotation marks
omitted). Thus, a time, place, and manner restriction can be placed on a traditional
public forum only if it is content neutral, narrowly tailored to achieve a significant

government interest, and "leave[s] open ample alternative channels of communication." Id.

A designated public forum is "government property that has not traditionally been regarded as a public forum" but that has been "intentionally opened up for that purpose." Christian Legal Soc'y, 130 S. Ct. at 2984 n.11 (quoting Pleasant Grove City, 129 S. Ct. at 1132). To create a designated public forum, the government must intentionally open up a location or communication channel for use by the public at large. Cornelius, 473 U.S. at 802; see also Forbes, 523 U.S. at 677 ("The government does not create a designated public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional public forum for public discourse.") (internal quotation marks and alteration omitted). And, "a school creates a designated public forum only when school authorities have by policy or practice opened those facilities for indiscriminate use by the general public." Bannon v. Sch. Dist. of Palm Beach Cnty., 387 F.3d 1208, 1213 (11th Cir. 2004) (internal quotation marks omitted). Just as with a traditional public forum, a time, place, and manner restriction can be placed on a designated public forum only if it is content neutral, narrowly tailored to achieve a significant government interest, and "leave[s] open ample alternative channels of communication." Perry Educ. Ass'n, 460 U.S. at 45-46.

Finally, in the Supreme Court's nomenclature, a limited public forum may be established when the government limits its property "to use by certain groups or dedicate[s it] solely to the discussion of certain subjects." Christian Legal Soc'y, 130 S. Ct. at 2984 n.11 (quoting Pleasant Grove City, 129 S. Ct. at 1132). Any restrictions made on expressive activity in a limited public forum only must be reasonable and viewpoint neutral. Id. at 2984. Reasonableness in this context "must be assessed in the light of the purpose of the forum and all the surrounding circumstances." Cornelius, 473 U.S. at 809. Moreover, the restriction "need not be the most reasonable or the only reasonable limitation." Id. at 808. In fact, "[i]mplicit in the concept" of a government forum that has not been opened widely to the general public is the government's "right to make distinctions in access on the basis of . . . speaker identity." Perry Educ. Ass'n., 460 U.S. at 49. Thus, "a speaker may be excluded from" a limited public forum "if he is not a member of the class of speakers for whose especial benefit the forum was created." Cornelius, 473 U.S. at 806; see also Good News Club v. Milford Cent. Sch., 533 U.S. 98, 106 (2001); Rosenberger v. Rector & Visitors of the Univ. of Va., 515 U.S. 819, 829 (1995).

In applying this nomenclature here, we cannot consider the GSU campus as a singular whole. Instead, as the Supreme Court has instructed in Cornelius, the

scope of the relevant forum is defined by "the access sought by the speaker," meaning that if a speaker seeks access only to a limited area of government property, we must tailor our approach to "the perimeters of a forum within the confines of the government property." 473 U.S. at 801. A university campus will surely contain a wide variety of fora on its grounds. See Bowman v. White, 444 F.3d 967, 976-77 (8th Cir. 2006) ("[L]abeling the campus as one single type of forum is an impossible, futile task."); Justice for All v. Faulkner, 410 F.3d 760, 766 (5th Cir. 2005) ("The Supreme Court's forum analysis jurisprudence does not require us to choose between the polar extremes of treating an entire university campus as a forum designated for all types of speech by all speakers, or, alternatively, as a limited forum where any reasonable restriction on speech must be upheld."). Plainly, Georgia Southern University's campus contains a multitude of facilities and land -- including classrooms, lecture halls, private offices, laboratories, dormitories, a performing arts center, sports facilities, open spaces, a botanical garden, a planetarium, a center for wildlife education, and a museum. Thus, any attempt to affix a single label on so large and diverse a campus likely would render the forum analysis meaningless.

Today we are called on to examine separately two distinct areas of the GSU campus where Bloedorn has sought to speak: the Free Speech Area, where outside,

18

non-sponsored members of the general public are allowed to speak; and GSU's

sidewalks, Pedestrian Mall, and Rotunda, where only GSU-affiliated expressive

conduct is permitted.  Our focus remains on GSU's intentions in establishing and

maintaining its property.  See Cornelius, 473 U.S. at 802.  Thus, we look first to

the policy and practice of the University and to the nature of the property and its

compatibility with expressive activity.  See id.

A.    Sidewalks, Pedestrian Mall, and Rotunda

Bloedorn claims that GSU should be preliminarily enjoined from enforcing

its absolute ban on all expressive activity by outside, non-sponsored speakers on

the University's sidewalks or its Pedestrian Mall, and in its Rotunda.  We are

unpersuaded.

As we see it, each of these campus sites falls into the category of a limited

public forum.  Again, a state-funded university is not a traditional public forum,

Widmar, 454 U.S. at 267 n.5, and GSU has expressed no intention to open these

areas to the general public for expressive conduct.  The University has limited

these areas only for use by a discrete group of people -- the GSU community; its

students, faculty, and employees; and their sponsored guests.  See Christian Legal

Soc'y, 130 S. Ct. at 2984 n.11 (explaining that a limited public forum is

established when the government opens "property 'limited to use by certain groups

19

or dedicated solely to the discussion of certain subjects'") (quoting Pleasant Grove City, 129 S. Ct. at 1132)); ACLU v. Mote, 423 F.3d 438, 444-45 (4th Cir. 2005). This is precisely the definition of a limited public forum.

Finally, the University is under no obligation to open its campus to outside, non-sponsored speakers; the First Amendment does not guarantee access to property for speech activities simply because the property is government-owned. Cornelius, 473 U.S. at 803. Necessarily then, there is no requirement "that a campus must make all of its facilities equally available to students and nonstudents alike, or that a university must grant free access to all of its grounds or buildings." Widmar, 454 U.S. at 267 n.5 (emphasis added).

Contrary to Bloedorn's suggestion, it is of lesser significance that the GSU sidewalks and Pedestrian Mall physically resemble municipal sidewalks and public parks. The physical characteristics of the property alone cannot dictate forum analysis. United States v. Kokinda, 497 U.S. 720, 727 (1990). "Publicly owned or operated property does not become a 'public forum' simply because members of the public are permitted to come and go at will." United States v. Grace, 461 U.S. 171, 177 (1983). Instead, we look to the traditional uses made of the property, the government's intent and policy concerning the usage, and the presence of any special characteristics. See Greer v. Spock, 424 U.S. 828, 837-38

20

(1976) (discussing the unique nature of military bases and the fact that these circumstances must be taken into consideration); Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. 503, 506 (1969) (noting the "special characteristics of the school environment").

Thus, by way of example, even though highway rest areas and municipal parks often are physically identical, we have found that a highway rest area, unlike a municipal park, is not a public forum precisely because "the government did not intend to open the forum to the same panoply of activity permitted in" municipal parks. Sentinel Commc'ns Co., 936 F.2d at 1204. Similarly, in Greer, the Supreme Court found that, even though a military base permitted free civilian access to certain unrestricted areas, the base was not thereby transformed into a public forum; the presence of sidewalks and streets within the base did not change that determination. 424 U.S. at 830, 835-38. And, in Kokinda, the Supreme Court found that a postal sidewalk -- a sidewalk running between the parking lot and the post office -- was not a traditional public forum because, although it was identical in appearance to the nearby municipal sidewalk, it was not constructed "to facilitate the daily commerce and life of the neighborhood or city," and it was "not expressly dedicated . . . to any expressive activity" by postal service regulations. 497 U.S. at 727-28, 730. It is immaterial that, inevitably, some expressive conduct

21

may occur in the forum because the law is clear that "the government does not create a public forum by permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse," id. at 730 (internal quotation marks and alterations omitted), and that the occurrence of expressive activity "in the context of the forum created does not imply that the forum thereby becomes a public forum for First Amendment purposes," Cornelius, 473 U.S. at 805.

Even though GSU's campus possesses many of the characteristics of a public forum -- including open sidewalks, streets, and pedestrian malls -- it differs in many important ways from public streets or parks. See Widmar, 454 U.S. at 267 n.5. Perhaps most important, the purpose of a university is strikingly different from that of a public park. Its essential function is not to provide a forum for general public expression and assembly; rather, the university campus is an enclave created for the pursuit of higher learning by its admitted and registered students and by its faculty.

Nor is this case like Grace, where the Supreme Court determined that the sidewalks comprising the outer edges of the property of the United States Supreme Court were indistinguishable from other public sidewalks in Washington, D.C., and, thus, constituted traditional public fora. 461 U.S. at 179-80. Here, the sidewalks, Pedestrian Mall, and Rotunda are all contained inside of the GSU

22

campus. All of the University's entrances are identified with large blue signs and brick pillars, all of the buildings are identified with large blue signs, and all of its parking lots have signs restricting their use to GSU community members.[2]

B.    Free Speech Area

On this limited preliminary injunction record, we conclude that the Free Speech Area essentially falls into the category of a designated public forum. The University's Speech Policy, which broadly allows expressive conduct both by GSU-affiliated individuals and groups and non-sponsored outsiders alike in the Free Speech Area, suggests strongly that GSU has intentionally opened this specific and limited area of the campus "for public discourse." Forbes, 523 U.S. at 677 (internal quotation marks omitted). GSU has in no way limited this property to use by a specific category of group or speaker, nor has it limited discussion to certain topics or entirely prohibited expressive conduct on the premises. See Christian Legal Soc'y, 130 S. Ct. at 2984 n.11; Gay Lesbian Bisexual Alliance v. Pryor, 110 F.3d 1543, 1548 (11th Cir. 1997). Rather, the University has intentionally opened this limited space at the crossroads of the campus to its student body and to the general public without any restrictions on content. In

_____

[2] The appellant has not presented any evidence supporting the claim that the district court erred in failing to analyze separately interior sidewalks falling within the geographic boundaries of the GSU campus and perimeter sidewalks on Statesboro's public streets. We, therefore, have no occasion to draw any such distinction on this limited record.

23

short, because the Free Speech Area appears to have most of the essential

characteristics of a designated public forum, any time, place, and manner

restrictions placed on its use must be content neutral, narrowly drawn to achieve a

significant government interest, and leave open ample alternative channels for

communication. Perry Educ. Ass'n, 460 U.S. at 45-46; see also Bowman, 444

F.3d at 979.

## IV.

Having characterized the nature of the University's property at issue, we

turn to Bloedorn's specific challenges to its Speech Policy. First, appellant claims

that the University has impermissibly banned him from speaking on GSU's

sidewalks and Pedestrian Mall and in the University's Rotunda. Again, we are

unpersuaded.

In analyzing the constitutional validity of GSU's Speech Policy, we are

mindful of the Supreme Court's recent words:

> Our inquiry is shaped by the educational context in which it arises: First
> Amendment rights, we have observed, must be analyzed in light of the
> special characteristics of the school environment. This Court is the final
> arbiter of the question whether a public university has exceeded
> constitutional constraints, and we owe no deference to universities when
> we consider that question. Cognizant that judges lack the on-the-ground
> expertise and experience of school administrators, however, we have
> cautioned courts in various contexts to resist substituting their own
> notions of sound educational policy for those of the school authorities
> which they review.

24

Christian Legal Soc'y, 130 S. Ct. at 2988 (internal quotation marks and citations omitted).

Because the University's sidewalks, Pedestrian Mall, and Rotunda are limited public fora, any time, place, and manner restrictions made on expressive activity need only be viewpoint neutral and reasonable; and the restriction need not "be the most reasonable or the only reasonable limitation." Cornelius, 473 U.S. at 808. The regulation is constitutional so long as it is "reasonable in light of the purpose which the forum at issue serves." Perry Educ. Ass'n, 460 U.S. at 49.

The GSU campus is government property dedicated to education and learning by its accepted and registered students, as well as by its faculty and staff. "[T]he State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated." U.S. Postal Serv. v. Council of Greenburgh Civic Ass'ns, 453 U.S. 114, 129-30 (1981) (internal quotation marks omitted). Indeed, implicit in the idea that a government forum has not been opened widely and intentionally to the general public is the government's right to draw distinctions in access based on a speaker's identity. Perry Educ. Ass'n, 460 U.S. at 49. Thus, "a speaker may be excluded from" a limited public forum "if he is not a member of the class of speakers for whose

25

especial benefit the forum was created." <u>Cornelius</u>, 473 U.S. at 806; <u>see also</u>

<u>Good News Club</u>, 533 U.S. at 106.

Plainly, Bloedorn is not "a member of the class of speakers for whose

especial benefit the forum was created," <u>Cornelius</u>, 473 U.S. at 806, so he may be

constitutionally restricted from undertaking expressive conduct on the

University's sidewalks or its Pedestrian Mall or at its Rotunda.  Nor, on this

limited record, can there be any doubt that GSU's Speech Policy is both viewpoint

neutral and reasonable.  There is no record evidence suggesting (nor has Bloedorn

even alleged) that the ban on outside, non-sponsored speakers in these areas is

viewpoint-based; it applies equally to all outside, non-sponsored speakers.  Nor is

there any record evidence even remotely suggesting that the University has ever

made any exception to this policy.  Moreover, the policy is a reasonable one.  It

appears to further GSU's interest in preserving its limited facilities and resources

for its more than 18,000 students, its faculty, and its employees.  We add that GSU

has not denied outside, non-sponsored speakers from all access to its campus; the

University has only required them to speak in a designated Free Speech Area

located at the crossroads of one of the most highly trafficked areas of campus.

And, an outside speaker still may speak on the Pedestrian Mall or in the Rotunda if

he finds a GSU-affiliated sponsor.  GSU has the right to preserve its campus for its

26

intended purpose, and its method of doing so is both viewpoint neutral and reasonable.

In short, on this preliminary record, we cannot say that Bloedorn has clearly established a substantial likelihood of success as to this claim.  See Am. Civil Liberties Union of Fla., Inc., 557 F.3d at 1198 (requiring the movant for a preliminary injunction to "clearly establish[]" that there is "a substantial likelihood of success on the merits").

V.

Bloedorn also challenges several of the time, place, and manner restrictions contained in the University's permitting scheme.  But, on the record now before us, Bloedorn has not shown a substantial likelihood of success on the merits on any of these claims.  The University's regime appears to be content neutral, narrowly tailored to achieve a significant government interest, and leaves open ample alternative channels for communication.

A.   Content Neutral

To begin with, Bloedorn has not established that the permitting scheme discriminates based on content.  Moreover, there is little indication that the University's Speech Policy or its practices have afforded its officials unbridled discretion to assign the location, the time, or the length of the permits.

27

The Speech Policy is content neutral on its face. It does not discriminate in any way based on who the speaker may be or on the nature of the topic the speaker wishes to address. All outside, non-sponsored speakers must comply in the same way with the policy by first obtaining a permit to use the designated Free Speech Area. Indeed, Bloedorn has never even suggested that the Speech Policy's terms allow GSU to discriminate against outside, non-sponsored speakers based on content.

Instead, Bloedorn seems to argue that the University's permitting scheme, despite its content neutral language, is, in fact, content based because it reposes in its officials broad discretion to covertly discriminate based on content. Our law has long established that a permitting scheme would be content discriminatory, and thus amount to an unconstitutional prior restraint on speech, if the government exercised unbridled discretion to limit access to a particular public forum. Cooper v. Dillon, 403 F.3d 1208, 1215 (11th Cir. 2005); Burk v. Augusta-Richmond Cnty., 365 F.3d 1247, 1256 (11th Cir. 2004) ("Even a facially content-neutral time, place, and manner regulation may not vest public officials with unbridled discretion over permitting decisions."); Frandsen, 212 F.3d at 1236-37 (finding an unconstitutional prior restraint where a National Park Service licensing scheme gave a park official an unlimited time frame in which to grant or deny permits to

28

protest in the park).  The infirmity flowing from "unbridled discretion" is that it allows the government official to reject or limit the permit application based on improper content based considerations.  Thomas v. Chicago Park Dist., 534 U.S. 316, 323 (2002) ("Where the licensing official enjoys unduly broad discretion in determining whether to grant or deny a permit, there is a risk that he will favor or disfavor speech based on its content.").

In determining whether a permit policy is content based because it has granted an official "unbridled discretion," we examine first "the purpose behind the regulation."  Cooper, 403 F.3d at 1215.  And, "[a]s a general rule, laws that by their terms distinguish favored speech from disfavored speech on the basis of the ideas or views expressed are content based."  Id.  (internal quotation marks and citation omitted).  To avoid unbridled discretion, the permit requirements should contain narrowly drawn, reasonable, and definite standards to guide the official's decision.  Burk, 365 F.3d at 1256.

Thus, for example, in Burk, a panel of this Court found that a permit policy unlawfully granted unbridled discretion where it required the applicant to provide "an indemnification agreement in a form satisfactory to the attorney" for the city, because it provided no guidance about the meaning of the term "satisfactory."  365 F.3d at 1256 (internal quotation marks omitted).  And, in Frandsen, we found that

29

a permitting scheme provided the official with unbridled discretion because it did not enumerate a time period in which the official had to rule on the permit application, instead requiring only that he issue a permit "without unreasonable delay," without defining "unreasonable," thereby creating a situation where "[a] park superintendent who does not agree with the political message to be espoused could allow the permit request to sit on his desk for an indefinite period of time -- resulting in speech being silenced by inaction." 212 F.3d at 1240.

The GSU permitting scheme does not employ vague or undefined standards. While Bloedorn is correct that the GSU website contains a general statement that GSU retains the authority to determine the time and location of the permitted speech, GSU's actual policies and practices are more narrowly drawn than that. We consider the actual policies and practices employed by the University, not just the policy's text. See Forsyth Cnty., Ga. v. Nationalist Movement, 505 U.S. 123, 131 (1992) (explaining, in evaluating a claim of "unbridled discretion," that "we must consider the [government's] authoritative constructions of the ordinance, including its own implementation and interpretation of it").

University officials may not exercise unbridled discretion in determining the location of an outside, non-sponsored speaker's expressive activity. See, e.g., City of Lakewood v. Plain Dealer Publ'g Co., 486 U.S. 750, 769-70 (1988). It is the

express and undisputed policy of GSU that the Free Speech Area is the only venue
where an outside, non-sponsored speaker may undertake expressive conduct. And
there has been no showing that the University has deviated from this policy. Nor
do GSU officials appear to have broad discretion in assigning the date and time. It
is GSU's undisputed practice to issue a permit for a speaker's requested date and
time so long as the space has not already been reserved by another speaker or
group. Finally, the text of the Speech Policy does not afford unbridled discretion
in assigning the length of time for which the permit is granted, or the frequency.
The Speech Policy says that an outside speaker's "typical length of time" is one-
and-one-half hours and that "[f]requency should be no more than once a month
under normal circumstances."

Teresa Thompson, Vice President of Student Affairs and Enrollment
Management for GSU, averred in a supporting affidavit that the Speech Policy
"provides . . . that persons not affiliated with the University may reserve the Free
Speech area once a month for a period of one and one half hours." And, Bloedorn
has presented no evidence thus far that the University has ever granted a permit to
an outside, non-sponsored speaker to speak for a longer period of time or with
greater frequency. Nor does this limited record evince any pattern of favoritism
on the part of the University's officials. In short, GSU's permit application policy

does not appear to grant GSU unbridled discretion to determine the location, the time, or the length of the allowed speech. The University appears to have specifically drawn reasonable and definite standards, and applied those standards consistently, indicating a "well-established practice." Burk, 365 F.3d at 1256.

**B.**   Narrow Tailoring

Nor has Bloedorn shown a substantial likelihood that several of the time, place, and manner restrictions are not narrowly tailored to serve significant government interests.[3] A narrowly tailored time, place, and manner restriction on speech does not "burden substantially more speech than is necessary" to further a significant government interest. Ward v. Rock Against Racism, 491 U.S. 781, 799 (1989). So long as the policy is content neutral, the restriction "need not be the least restrictive or least intrusive means of doing so." Id. at 798. Rather, the government need only avoid "regulat[ing] expression in such a manner that a

---

[3] In his brief, Bloedorn also challenges, for the first time on appeal, the Speech Policy requirement that any distributed literature must identify the distributing organization or individual. Because this issue was never raised in the district court, we decline to consider it today. F.D.I.C. v. Verex Assurance, Inc., 3 F.3d 391, 395 (11th Cir. 1993) ("By well settled convention, appellate courts generally will not consider an issue or theory that was not raised in the district court."). Nor has Bloedorn ever alleged that he was seeking or would seek to distribute literature on the GSU campus. Accordingly, it is not clear, at least for now, that he has established standing to pursue this claim because he has not shown any imminent injury as a result of this time, place, and manner restriction. See Am. Civil Liberties Union of Fla., Inc., 557 F.3d at 1193-94.

substantial portion of the burden on speech does not serve to advance its goals."
Id. at 799.

We start then with the University's interests and ask whether they are
significant and whether the scheme avoids regulating speech in a manner that does
not service its goals. First, the University has a significant interest in regulating
competing uses of the Free Speech Area in order to ensure that diverse viewpoints
are heard and that the University's community members -- particularly the
students -- have ample access to scarce university facilities. See Berger v. City of
Seattle, 569 F.3d 1029, 1041 (9th Cir. 2009) ("[U]nder appropriate circumstances,
a permitting requirement governing the use of a public open space can further a
legitimate interest in the regulation of competing uses of that space."); Bowman,
444 F.3d at 980-81 (holding that "the fostering of a diversity of uses of University
resources" is a significant government interest). We have no doubt that a
university's interest in protecting the educational experience of its students is a
significant one. See Keyishian v. Bd. of Regents, 385 U.S. 589, 603 (1967) ("The
Nation's future depends upon leaders trained through wide exposure to [a] robust
exchange of ideas . . . .").

The University also has a significant interest in ensuring safety and order on
campus, especially where the Free Speech Area is sited at a highly trafficked area

33

of the campus, and the University employs a limited security force. "[A] State's interest in protecting the safety and convenience of persons using a public forum is a valid governmental objective." Heffron, 452 U.S. at 650 (internal quotation marks omitted); see also Thomas, 534 U.S. at 323 ("Regulations of the use of a public forum that ensure the safety and convenience of the people are not inconsistent with civil liberties . . . .") (internal quotation marks omitted). Furthermore, "consideration of a forum's special attributes is relevant to the constitutionality of a regulation since the significance of the governmental interest must be assessed in light of the characteristic nature and function of the particular forum involved." Heffron, 452 U.S. at 650-51 (finding that "[t]he flow of the crowd and demands of safety are more pressing in the context of" a state fair than of a public street). And, in making this analysis, we focus not just on ensuring the safety of the GSU community, but also on protecting the safety of the speaker himself. Considering the attributes of the University's Free Speech Area -- its outdoor location in one of the most highly trafficked areas of a campus with over 18,000 students that employs a limited number of security personnel (four or five public safety officers are on duty at any one time) -- there can be little doubt that considerations of safety are substantial.

1.    Disclosure Restriction

Bloedorn particularly challenges the University's requirement that an outside, non-sponsored speaker must disclose his name, telephone number, and e-mail address on the permit request form. As for this claim, he cannot clearly establish a substantial likelihood of success on the merits. There is significant evidence on this limited record that the disclosure restriction is tailored narrowly enough to maximize GSU's significant interest in allocating access to the University's scarce resource (the Free Speech Area), and in protecting the safety and security of its community. The disclosure requirement allows GSU to contact the applicant to alert him that his permit has been granted or denied, discourages criminal activity, and provides basic contact information in the event anyone is injured or any property is damaged. Notably, the University requires its own students and other community members to disclose the very same information any time they seek to reserve a campus area for a speech activity.

History has taught us that sometimes registration requirements including the obligation to disclose a speaker's name may chill potential speakers by eliminating anonymous speech. See Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Village of Stratton, 536 U.S. 150, 166 (2002); McIntyre v. Ohio Elections Comm'n, 514 U.S. 334, 341-42 (1995) (After all, "a decision in favor of anonymity may be motivated by fear of economic or official retaliation, by concern about social

35

ostracism, or merely by a desire to preserve as much of one's privacy as possible."). But, the GSU restriction requires only that Bloedorn identify himself to the university officials who process his permit application; there is no requirement that he provide his name or contact information to anyone else. In that sense, he may remain an anonymous speaker. More importantly, we are hard-pressed to think of an alternative scenario that would afford Bloedorn greater anonymity while still allowing the University to have some way to contact him in order to tell him that his permit has been approved, or to advise him of any necessary rescheduling. Nor must we think of one, because, of course, the restriction "need not be the least restrictive or least intrusive means of doing so." Ward, 491 U.S. at 798.

Quite simply, without the ability to contact outside, non-sponsored speakers about the results of their permit applications, the University cannot efficiently or effectively schedule the use of the highly-demanded Free Speech Area. We repeat these undisputed facts: this is an area of campus that is heavily utilized; in fact, it is in use five out of seven days a week during the academic year. And, because it is apparently the choicest venue on campus to reach the widest audience, GSU students and community members also compete for access to this space. We add that, because we are dealing with a large university campus with a small security

36

department, unlike a city street or park that may be protected by a far larger police force, there is a real need to ensure the safety of students and visitors alike.

## 2. 48-Hour Notice Restriction

Bloedorn also claims that the permitting scheme's requirement that all outside, non-sponsored speakers obtain a permit to speak in the Free Speech Area at least 48 hours in advance is not narrowly tailored to meet the University's significant interest in maintaining safety and order on campus. Again, we are unpersuaded that Bloedorn has clearly established a substantial likelihood of success on the merits.

GSU's safety concern is not only with protecting its more than 18,000 students and countless other community members, but also with protecting the speaker from the thousands of individuals passing by the area every day. Crowds, and potentially unruly ones, are inevitable in a highly trafficked area of a large university campus. In fact, because of the location of the Free Speech Area, it is unlikely that any speaker using the area would fail to attract attention.

GSU claims that it needs 48 hours advance notice to prepare its Public Safety Department to receive an outside, non-sponsored speaker. As we have noted, GSU typically has only four or five public safety personnel patrolling the campus at a time. Any time an outside, non-sponsored speaker reserves the Free

Speech Area, the Department of Public Safety is notified, and two campus security personnel are assigned. When required to so assign its officers, the Department of Public Safety must alter its employee schedule to ensure that there are sufficient public safety officers to patrol the rest of the campus. Advance notice of 48 hours seems reasonably calculated to achieve a significant purpose. We add that the 48-hour notice period is brief -- a mere two days. Other circuits have upheld university permitting schemes that require significantly more advance notice. See Bowman, 444 F.3d at 982 (finding that a 3-day notice requirement was narrowly tailored to serve a significant interest in campus safety, because "a university is less able than a city or other entity with police powers to deal with a significant disruption on short notice"); Sonnier v. Crain, 613 F.3d 436, 445 (5th Cir. 2010) (upholding a 7-day notice requirement imposed by Southeastern Louisiana University, because "[u]niversities are less equipped than cities and other public fora (or designated public fora) to respond to disruptions on short notice. Providing a university with advance notice allows the university to adequately take care of any issues associated with the public speech or demonstration that might hamper the university's ability to meet its primary goal -- the education of students.").

3. Time Restriction

38

Bloedorn also argues that the time restriction contained in the permitting scheme -- the limitation of a permit to an outside, non-sponsored speaker to one-and-one-half hours no more than once a month -- is not narrowly tailored to meet the University's significant interests in regulating competing uses of the site and in ensuring that its students have ample access to the facility. The University has offered sufficient evidence on this limited record to show that the time restriction is narrowly tailored to achieve its interest in providing the broadest access to this scarce resource, thereby offering the students exposure to a wider variety of viewpoints.

The time restriction is not draconian. Under the policy, Bloedorn can speak for an extended time period. One-and-one-half hours is longer than most college lectures, than most television shows, and than many movies; it is no less time than is generally allocated for a presidential debate, and it is substantially more time than this Court affords for oral argument. Moreover, in context, it does not appear to us to be an insubstantial amount of time when that speech occurs at the epicenter of the campus near the Student Center, dining facilities, and a bus stop for the GSU bus service, and where the venue itself is a scarce resource. The University has offered, and Bloedorn has not challenged, that there appears to be a

39

large number of university speakers who want to use the Free Speech Area, and that the policy promotes the propagation of a wide variety of viewpoints.

Although more debatable on this limited record, we think the requirement that an outside, non-sponsored speaker is limited to once a month preliminarily passes constitutional muster. In the words of Assistant Director of Facilities for GSU Susan Nelson, the Free Speech Area and the adjacent Rotunda are "heavily utilized by university students and/or for university programs"; the area is reserved by "[s]tudents and university personnel . . . for any number of purposes and events"; and "is in use five out of seven days a week." Again, the area is a very scarce resource for which students and university programs appear to heavily compete, and there is little doubt that the University may give its own students a priority in using this scarce facility.

Bloedorn points out, however, that the University conceivably could create a wait list system, similar to the one suggested in dicta by the Eighth Circuit in Bowman. See 444 F.3d at 981-82. But our analysis does not turn on what is theoretically possible for the University to do. A valid time restriction need not be the "least restrictive" or "least intrusive" means of achieving the significant government interest. Ward, 491 U.S. at 798. We are not prepared today to impose on GSU the added administrative burden of creating and monitoring a wait list and

of constantly communicating with individuals who are in no way affiliated with the University. While Bloedorn has not shown a substantial likelihood that the once-a-month restriction is not narrowly tailored, we do not foreclose the possibility that, on a more ample record, he may be able to do so. The University could have done more to explain just how "used" the Free Speech Area is during the five school days in a week by the GSU community. Thus, for example, we cannot tell how often the Free Speech Area, as opposed to the adjacent Rotunda, is utilized by University students or for University programs. Nor are we told precisely what "heavily utilized" means. But, we can say with confidence that, on this preliminary injunction record, Bloedorn has not shown a substantial likelihood of success concerning the frequency limitation imposed by the University.

## C.    Ample Alternative Channels

Finally, the record shows that the University has left open ample alternative channels for communication for Bloedorn to get his message out to the student body. This is an large campus located in Statesboro, Georgia. Surrounding the campus on every side are public streets and sidewalks from which Bloedorn can preach his message to GSU community members as they enter and exit the campus apparently without any limitations imposed by the University. Not only can GSU

41

students walk from campus to the nearby streets of Statesboro, but GSU even runs a bus service that transports students to a variety of off-campus locations. Bloedorn can avoid the limitations imposed by the permitting scheme simply by speaking to students as they enter and exit the campus from GSU's several well-marked entrance and exit points.

Finally, Bloedorn could conceivably obtain sponsorship from one of the countless GSU-affiliated organizations to speak on campus. And, if he were so sponsored, Bloedorn would not have to comply with the limitations on outside, non-sponsored speakers. Indeed, there is no evidence in this record that Bloedorn made even the slightest attempt to reach out to any GSU faculty, staff, students, or affiliated organizations to find a sponsor.

In as much as Bloedorn has failed to establish a substantial likelihood of success on the merits as to any of his claims, we need not, and do not, examine whether he has suffered irreparable harm, or whether a balance of the hardships weighs in his favor, or, finally, whether the public interest would support the issuance of a preliminary injunction. See Pittman, 267 F.3d at 1292.

On this limited record, we

**AFFIRM.**

A True Copy - Attested
Clerk U.S. Court of Appeals,
Eleventh Circuit

By: _____
Deputy Clerk
Atlanta, Georgia

42

UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT
BILL OF COSTS

BENJAMIN BLOEDORN
_____
Appellant

vs.

Appeal No. 10-10168-A

DR. BRUCE GRUBE, et al.
_____
Appellee

A Bill of Costs should only be filed when the Clerk's Office has advised that the party is entitled to costs. Fed.R.App.P. 39 and 11th Cir. R. 39-1 (see reverse) govern costs which are taxable in this court and the time for filing the Bill of Costs. A motion for leave to file out of time is required for a Bill of Costs not timely received.

### INSTRUCTIONS

In the grid below, multiply the number of original pages of each document by the total number of documents reproduced to calculate the total number of copies reproduced. Multiply this number by the cost per copy ($.15 per copy for "In-House", up to $.25 per copy for commercial reproduction, supported by receipts) showing the product as costs requested.

| DOCUMENT | Repo. Method (Mark One) | | No. of Original Pages | Total No. Documents Reproduced | Total No. of Copies | COSTS REQUESTED | CT. USE ONLY COSTS ALLOWED |
|---|---|---|---|---|---|---|---|
| | In-House | Comm* | | | | | |
| Appellant's Brief | | | | | | | |
| Record Excerpts | | | | | | | |
| Appellee's Brief | X | | 39 | 10 **(9)** | 390 | 58.50 | **52.65** |
| Reply Brief | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| *Note: If reproduction was done commercially, receipt(s) must be attached. | | | | | **TOTAL** | $ 58.50 | $ **52.65** |
| | | | | | | REQUESTED | ALLOWED |

I hereby swear or affirm that the costs claimed were actually and necessarily incurred or performed in this appeal and that I have served this Bill of Costs on counsel/parties of record.

Date Signed: 2/3/11

Signature: _____

Attorney for: Dr. Bruce Grube and Dr. Teresa Thompson
(Type or print name of client)

Attorney Name: Michelle Hirsch
(Type or print your name)

A True Copy   Attested
Clerk U.S. Court of Appeals,
Eleventh Circuit

By: _____
Deputy Clerk
Atlanta, Georgia

### FOR COURT USE ONLY

Costs are hereby taxed in the amount of $ **$52.65** against **Appellant**

and payable directly to **Appellee**

Issued on: **FEB 2 8 2011**

John Ley, Clerk of Court

By: _____
Deputy Clerk

MISC-12
5/4/10

# UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

John Ley
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

February 28, 2011

Scott L. Poff
United States District Court
125 BULL ST RM 308
SAVANNAH, GA 31401-3762

Appeal Number: 10-10168-FF
Case Style: Benjamin Bloedorn v. Dr. Bruce Grube, et al
District Court Docket No: 6:09-cv-00055-BAE-GRS

The enclosed certified copy of the judgment and a copy of this court's opinion are hereby issued as the mandate of this court.

Also enclosed are the following:

Bill of Costs

Original record on appeal or review, consisting of: two volumes.

The clerk of the court or agency shown above is requested to acknowledge receipt on the copy of this letter enclosed to the clerk.

A copy of this letter, and the judgment form if noted above, but not a copy of the court's decision, is also being mailed to counsel and pro se parties. A copy of the court's decision was previously mailed to counsel and pro se parties on the date it was issued.

Sincerely,

JOHN LEY, Clerk of Court

Reply to: James O. Delaney
Phone #: 404-335-6113

Enclosure(s)

MDT-1 Letter Issuing Mandate